UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SUSAN ALPAJON,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:13-cv-617
Beckwith, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).[1]   This matter is before the Court on plaintiff's Statement

of Errors (Doc. 10), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply

(Doc. 16).

**I.  Procedural Background**

Plaintiff filed an application for DIB in February 2011, alleging disability since August

29, 2009[2], due to pain in her torso, ribs and back and Attention Deficit Disorder (ADD).   (Tr.

220).   Plaintiff's application was denied initially and upon reconsideration.   Plaintiff, through

counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ)

Larry A. Temin.   Plaintiff and a vocational expert (VE) appeared and testified at the ALJ

hearing.   On May 21, 2013, the ALJ issued a decision denying plaintiff's DIB application.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ

---

[1]There is also an application for Supplemental Security Income in the record.   (Tr. 167-71).   However, it does not
appear that this application was adjudicated by the ALJ.
[2]Plaintiff subsequently amended her alleged disability onset date to August 30, 2010.   (Tr. 34).

the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since August 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: lumbar degenerative disc disease; history of L2 compression fracture; thoracic spondylosis; peripheral arthritis; myalgias and myositis; attention deficit hyperactivity disorder (ADHD); anxiety; and opiate dependence (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform work activity except as follows: The [plaintiff] can lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk a total of six hours in an eight-hour workday (30 minutes at a time, then must be able to sit for 1-2 minutes). She can sit a total of six hours in an eight-hour workday (30 minutes at a time, then must be able to stand for 1-2 minutes). She can twist no more than frequently. She can only occasionally stoop, kneel, crouch, and climb ramps or stairs. She can never crawl, climb ladders/ropes/scaffolds, or work at unprotected heights or around hazardous machinery. The [plaintiff] should not work with concentrated exposure to high humidity. The [plaintiff] is able to remember and carry out detailed but uninvolved instructions. Her job should not require more

3

than superficial interaction with the general public, coworkers, or supervisors. The [plaintiff] cannot work at a rapid production-rate pace, and her job should not require more than ordinary and routine changes in work setting or duties.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[3]

7.   The [plaintiff] was born [in] . . . 1965 and was 44 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has a "limited" education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1569 and 404.1569(a)).[4]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from August 30, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-24).

## C.   Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.   *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[3]Plaintiff has past relevant work as a cashier, courier, and waitress, which she performed at the light exertional level, and as a Certified Nurse's Aide, which she performed at the medium exertional level.   (Tr. 22, 284).

[4]The ALJ relied on the VE's testimony to find that plaintiff could perform the requirements of the unskilled sedentary jobs of assembler, inspector and packager (1,725 jobs in the regional economy and 204,000 jobs in the national economy).   (Tr. 23).

4

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

Plaintiff alleges as her sole assignment of error that the ALJ erred in weighing the medical opinion evidence of record. Plaintiff specifically contends that the ALJ erred by failing to accord proper weight to the opinions of (1) her "treating physicians," Drs. Michael J. Bertram, M.D., and Lisha Fieler, M.D., (2) her mental health counselor, Ms. Sandra J. Snyder, M.Ed., and (3) the consultative examining psychologist, Dr. Norman Berg, Ph.D., and by instead giving

5

greater weight to the opinions of the state agency non-examining medical sources, Dr. Lynne

Torello, M.D., and Dr. Jennifer Swain, Psy.D. (Doc. 10).

**1. The ALJ did not err in weighing the medical opinion evidence.**

The Social Security regulations set forth the various types of evidence, both medical and

nonmedical, that a claimant may present in order to establish she is disabled and entitled to DIB.

*See* 20 C.F.R. § 404.1513. In order to establish a disability, the claimant must present evidence

from "acceptable medical sources." 20 C.F.R. § 404.1513(a). "Acceptable medical sources"

include licensed physicians and licensed or certified psychologists. 20 C.F.R. §

404.1513(a)(1)-(2).

"Acceptable medical sources" are further classified into three types: treating sources,

examining sources, and nonexamining sources. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873,

875 (6th Cir. 2007). Only "acceptable medical sources" as defined under 20 C.F.R. §

404.1513(a) can provide evidence establishing the existence of a medically determinable

impairment, give medical opinions, and be considered treating sources whose medical opinions

may be entitled to controlling weight. *Id*. at 875-76.

A nontreating but examining source has examined the claimant "but does not have, or

did not have, an ongoing treatment relationship with" her. 20 C.F.R. § 404.1502. A treating

source has not only examined the claimant but also has an "ongoing treatment

relationship" with her consistent with accepted medical practice. *Id*. A physician seen

infrequently by the claimant can be a treating source "if the nature and frequency of the treatment

or evaluation is typical for [the] condition(s)." *Id*.

Although the ALJ is required to "evaluate every medical opinion [the ALJ] receive[s],"

20 C.F.R. § 404.1527(c), the ALJ need not treat all medical opinions equally. *Smith*,

482 F.3d at 875. Under the "treating physician rule," the ALJ "'will' give a treating

source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the]

case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R.

§ 404.1527(d)(2))[5]. If the ALJ does not give the treating source's opinion controlling weight,

the ALJ must give "good reasons" for his decision to give the opinion less than controlling

weight. *Id*. The ALJ must apply specified factors in determining what weight to give the

opinion, including "the length of the treatment relationship and the frequency of examination, the

nature and extent of the treatment relationship, supportability of the opinion, consistency of the

opinion with the record as a whole, and any specialization of the treating physician." *Id*. (citing

*Wilson*, 378 F.3d at 544) (citing 20 C.F.R. 404.1527(d)(2)). The "good reasons" requirement

"only applies to treating sources." *Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 514 (6th Cir.

2010).

In addition to "acceptable medical sources," the claimant may also present evidence from

"other sources." 20 C.F.R. § 404.1513(d). "Other sources" include medical sources such as

therapists who do not qualify as "acceptable medical sources," and non-medical sources such as

educational personnel. 20 C.F.R. § 404.1513(d)(1)-(2). The ALJ has discretion to determine

the proper weight to accord opinions from "other sources." *Cruse v. Comm'r of Soc. Sec*., 502

F.3d 532, 541 (6th Cir. 2007). Information from "other sources" may be based on special

knowledge of the individual and may provide insight into the severity of an individual's

---

[5]Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

impairment and how it affects the individual's ability to function. SSR 06-03p, 2006 WL 2329939, at *2. Although the opinions of "other sources" cannot establish the existence of a disability, their perspective should be "evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file." *Id.* (citing SSR 06-03p, 2006 WL 2329939, at *6). It may be appropriate to give more weight to the opinion of a non-medical source if he or she has seen the individual more often than the treating source or medical source and has provided better supporting evidence and a better explanation for his or her opinion. *Id.*, at *6. Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id.* at 4-5; *see also Cruse*, 502 F.3d at 541. Not every factor will apply in every case. SSR 06-03p, 2006 WL 2329939, at *5. The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.*, at *6.

### a. Plaintiff's physical impairments

There are two medical opinions on plaintiff's physical functional capacity in the record. Dr. Torello, a state agency non-examining physician, reviewed the file and completed a physical RFC assessment on December 1, 2011. (Tr. 102-04). Dr. Torello opined that plaintiff could lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently; stand/walk about

8

six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 102). She also found that plaintiff should "alternate positions at will to relieve pain." (*Id.*). The ALJ gave "significant weight" to Dr. Torello's RFC, but rejected the restriction that plaintiff be permitted to "alternate positions at will" as unsupported by the objective evidence; instead, the ALJ imposed a restriction that plaintiff be allowed to alternate positions every 30 minutes. (Tr. 21).

Dr. Bertram, plaintiff's treating physician, completed a "Social Security Disability Questionnaire" dated January 18, 2012, which had been provided by plaintiff's counsel and included questions specifically tailored to plaintiff's symptoms. (Tr. 629-30). Dr. Bertram indicated that he had first seen plaintiff on September 22, 2010, and he had last seen her on December 20, 2011. (Tr. 629). He diagnosed plaintiff with thoracic pain, disc herniation, and compression fracture. (*Id.*). In response to a question seeking a "technical" medical explanation for plaintiff's claim of "persistent severe pain" in the mid back "radiating around her ribcage on both sides all the way to the area of her breast or chest," Dr. Bertram wrote, "[p]atient states her pain in thoracic began after chiropractic manipulation"; she had undergone a bone scan showing degenerative joint disease at the facets and rib joints, and arthritis pain at these locations was likely the cause of pain and referral; and she suffers some lumbar pain from an old compression fracture.[6] (*Id.*). Dr. Bertram opined that plaintiff could sit for 3 hours total out of an 8-hour day, she could stand or walk for 3 hours in an 8-hour day, and she would need to lie down for 1-2 hours out of 8 hours. (Tr. 630). Dr. Bertram noted that "a Functional Capacity Evaluation could help with better estimates" of plaintiff's functional abilities. (*Id.*). Dr.

---

[6] Dr. Bertram listed another source of plaintiff's lumbar pain, but his writing is illegible.

9

Bertram noted that he was prescribing Percocet, Baclofen for spasms, and Neurontin for neuropathic pain, and the side effects were possible sedation and drowsiness. (*Id.*). The ALJ declined to give Dr. Bertram's opinion "controlling weight" and instead determined that Dr. Bertram's opinion was entitled to only "little weight." *Id.*

Plaintiff argues that the ALJ erred when he "completely disregarded" Dr. Bertram's opinion as to the extent of plaintiff's physical limitations, "played doctor," "cherry picked" the evidence to locate findings to support his decision, considered irrelevant matters, and completely abdicated his responsibility to assess Dr. Bertram's opinion in the manner required by the applicable regulations and rulings. (Doc. 10 at 8-10) (emphasis in original). For the reasons that follow, the Court finds the ALJ's decision to afford "little weight" to Dr. Bertram's opinion is supported by substantial evidence.

Plaintiff argues that Dr. Bertram's findings are supported by the diagnostic studies and his own physical exams. Plaintiff points to imaging study results from 2007 and 2010 to show that the ALJ erred by affording Dr. Bertram's assessment "little weight." (Doc. 16 at 2-3, citing Tr. 535, 536). The MRI taken of plaintiff's thoracic spine on September 28, 2010 showed minimal bone marrow edema inferior endplate anterior column L2 probably representing osteoporotic compression. The radiologist also found a minimal disc bulge at L1-L2 not affecting the spinal cord or exiting nerve roots. (Tr. 535). The total body bone scan taken that same day showed increased tracer uptake in the L2 vertebral body consistent with a healing compression fracture and peripheral arthritis. (Tr. 536). Dr. Bertram's progress notes also reference a June 2007 MRI showing moderate paracentral L5-S1 disc herniation and mild disc bulging at L1-2 (*see, e.g.*, Tr. 510, 514, 519), but the actual MRI is not in the record. Plaintiff contends that the bone

10

scan findings in particular corroborate her complaints of thoracic pain radiating around both rib

cages, and she contends that findings of tenderness and spasms made on physical examination

show that Dr. Bertram's assessment was based on more than her subjective complaints. (*Id.*,

citing 518-19, 514-15, 505-06, 561-62, 559-60, 555-56, 551-52).

    The ALJ reasonably determined that Dr. Bertram's assessment was inconsistent with his

*own* interpretation of the imaging results, and the ALJ was entitled to rely on this inconsistency

to discount the weight afforded Dr. Bertram's assessment. (Tr. 21, citing Tr. 515, 632). In

October 2010, shortly after Dr. Bertram began treating plaintiff, he reported:

> Patient's primary concern is the rib pain bilaterally and she has very minimal mid
> thoracic pain. She stated she thought it started after a manipulation. . . .
> However, *I cannot find any significant abnormalities on MRI or bone scan.* I
> still think conservative treatment for possible soft manipulation could be of help
> to get her back into improvement. She further states that the pain medicines
> almost eliminate the pain. . . .

(Tr. 515) (emphasis added). Although subsequent treatment records show plaintiff continued to

have rib and thoracic pain, in August 2011, Dr. Bertram reported that "[a]t the current time she

has predominantly back pain but I do not have significant objective findings to support the cause

for ongoing back pain." (Tr. 632). However, in January 2012, Dr. Bertram opined that arthritis

pain in the facets and rib joints was likely causing plaintiff's pain. (Tr. 629). The ALJ

reasonably determined that Dr. Bertram's January 2012 opinion was inconsistent with Dr.

Bertram's own assessment that her MRIs and bone scan did not disclose "any significant

abnormalities" or "significant objective findings to support the cause for ongoing back pain."

(Tr. 21, citing Tr. 515, 632). Dr. Bertram provided no explanation for the change in his opinion

and this inconsistency alone supports the ALJ's decision to discount Dr. Bertram's opinion. *See*

20 C.F.R. § 404.1527(b)(3) (explaining that "[t]he better explanation a source provides for an

opinion, the more weight we will give that opinion"); *see also Stanley v. Sec'y of HHS,* 39 F.3d 115, 118 (6th Cir. 1994) (ALJ could reject treating physician's opinion where it was contrary to previously expressed view and where physician "did not provide any objective medical evidence to support his change of heart") (citing *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988)).

The ALJ also reasonably determined that the exertional limitations Dr. Bertram assessed were inconsistent with his physical examination findings. On initial examination, which the ALJ found was the only thorough examination in any of Dr. Bertram's records, plaintiff exhibited tenderness along the spine and ribs, but normal gait, normal posture, normal reflexes, and 5/5 strength throughout. (Tr. 21, citing Tr. 518). In support of Dr. Bertram's opinion, plaintiff points to other findings noted in Dr. Bertram's 2011 records, such as tenderness in the thoracic paraspinal muscles, local spasms, and trigger points. (Doc. 16 at 3-4). However, Dr. Bertram discounted the significance of such findings by reporting that he did not have "significant objective findings to support the cause for ongoing back pain." (Tr. 632). Likewise, the physical examination findings at plaintiff's numerous emergency room visits were relatively benign. (Tr. 338, 348-49, 5/8/10- plaintiff well-appearing, in no acute distress, intact gait, "very benign abdominal exam"; Tr. 297, 298, 300, 5/30/10- no motor or sensory deficits, no acute abnormalities on chest x-ray; Tr. 371, 377, 7/7/10- nontender cervical, thoracic and lumbar spine, no muscle tenderness, "completely nontender" abdomen, normal chest x-ray; Tr. 310-11, 7/23/10- plaintiff was noted to be in no apparent pain when she left emergency room; Tr. 330, 335-36, 7/26/10- plaintiff well-appearing, in no acute distress, abdomen soft and tender, no chest tenderness; Tr. 316, 323-24, 7/27/10- physical examination generally unremarkable, no acute objective findings concerning for significant pathological process; Tr. 361-62, 365, 7/30/10- CT

12

scan for chronic chest wall pain yielded normal results; Tr. 518, 9/22/10- physical examination

findings, including strength, reflexes, and sensory, were normal except for limited range of

motion and mild discomfort; Tr. 730-34, 10/23/12- no tenderness to palpation, no back

tenderness, good range of motion in all major joints).

In addition to the lack of objective findings in support of Dr. Bertram's assessment, the

ALJ properly considered a number of other regulatory factors when weighing Dr. Bertram's

opinion. The ALJ took into account Dr. Bertram's specialization, noting that he is a pain

management physician and not an orthopedist. (Tr. 21). The ALJ further found the assessment

and treatment notes from May 2012 indicating plaintiff reported no side effects from her pain

medication were inconsistent with Dr. Bertram's report of possible side effects from Percocet,

Baclofen and Neurontin in his January 2012 assessment. (*Id.*, citing Tr. 648; *see also* Tr. 644,

646, 650, 654). The ALJ also took into account Dr. Bertram's failure to mention plaintiff's

inappropriate use of narcotics. (Tr. 21). Plaintiff faults the ALJ for discounting Dr. Bertram's

opinion based on this consideration, alleging that Dr. Bertram continued to treat her with pain

medication despite his knowledge of her dependence upon it and she was honest with Dr.

Bertram about her emergency room visits. (Doc. 10 at 9, citing Tr. 276-77; Doc. 16 at 5).[7]

However, the ALJ's decision recounts in detail plaintiff's multiple emergency room visits and

multiple instances of drug-seeking behavior, which ultimately resulted in Dr. Bertram's refusal to

prescribe plaintiff any more opiate medications for violating her pain contract. (Tr. 16-19). Dr.

---

[7] It does not appear that plaintiff advised Dr. Bertram of all of her the emergency room visits. See, e.g., Tr. 638, December 9, 2011 (no mention of ER visit at December 20, 2011 visit with Dr. Bertram); Tr. 648-49, April 29, 2012 (no mention of ER visit at May 16, 2012 visit with Dr. Bertram). It also appears that when confronted with an Ohio OARRS report showing evidence of use of tramadol, plaintiff admitted she went to the emergency room for treatment. (Tr. 642).

Bertram's failure to mention plaintiff's inappropriate use of narcotics was an appropriate factor

for the ALJ to consider when weighing Dr. Bertram's opinion against the whole of the medical

evidence. Contrary to plaintiff's argument, the ALJ properly considered the regulatory factors

of treatment relationship, supportability, consistency, and specialization in assessing Dr.

Bertram's opinion.

Finally, insofar as plaintiff alleges that the ALJ "played doctor" by considering whether

Dr. Bertram's findings were supported or consistent with the evidence, "an ALJ does not

improperly assume the role of a medical expert by assessing the medical and non-medical

evidence. . . ." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 722 (6th Cir. 2012) (citing

*Poe v. Comm'r. of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)). *See also Coldiron v.

Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("An ALJ does not improperly

assume the role of a medical expert by weighing the medical and non-medical evidence before

rendering an RFC finding."). To the contrary, the ALJ must review all of the evidence to make

the ultimate decision as to whether that evidence "proves or undermines" the individual's claim

of disability. *Id*. (quoting 20 C.F.R. §§ 404.1527(c)-(d), 416.927(c)-(d)). *See also* 20 C.F.R. §§

404.1545(a)(3), 404.1546(c) (ALJ is responsible for evaluating the medical and other evidence to

determine RFC). Therefore, the ALJ properly assessed the consistency of Dr. Bertram's

findings with the medical evidence without assuming the role of medical expert or doctor.

Even where there is substantial evidence in the record to support an opposite conclusion,

the ALJ's decision must be affirmed if it is supported by substantial evidence. *Smith v. Chater*,

99 F.3d 780, 782 (6th Cir. 1996). Here, the ALJ addressed the regulatory factors when

determining the weight to assign Dr. Bertram's opinion and complied with the treating physician

14

rule. The ALJ gave "good reasons" for affording Dr. Bertram's opinion "little weight" and those reasons are substantially supported by the record.

### b. Plaintiff's mental impairments

Plaintiff alleges that the ALJ erred by failing to properly weigh the opinions of the mental health sources. Plaintiff specifically alleges that the ALJ erred by giving "some weight" to the opinion of the consultative examining psychologist, Dr. Berg, and "significant weight" to the opinion of the state agency non-examining psychologist, Dr. Swain. (Doc. 10 at 10-11). Plaintiff alleges that Dr. Berg confirmed a diagnosis of Adult Attention Deficit Hyperactivity Disorder (ADHD) and expressed "great reservations" as to whether plaintiff could sustain employment due to this condition alone. (*Id*. at 11). Plaintiff contends that Dr. Berg's report, when read in the context of treatment records generated by Dr. Fieler and Ms. Snyder, provides strong support for a finding that plaintiff was "independently disabled from the standpoint of her ADHD." (*Id*. at 11). Plaintiff alleges that she had been treated for a "fairly extended period of time" by Dr. Fieler for her ADHD (*Id*., citing Tr. 594-607), and she had received a great deal of counseling at her church from Ms. Snyder, whom she identifies as a "licensed clinical counselor." (*Id*., citing Tr. 609).

Consultative examining psychologist Dr. Berg examined plaintiff on June 20, 2011. (Tr. 537-46). Dr. Berg diagnosed (1) "Attention-Deficit Hyperactivity Disorder, predominately inattentive type (as reported by claimant)"; and (2) "Physical pain; concern regarding being dependent on pain medication; report of difficulty with concentration." (Tr. 544). Dr. Berg

15

assigned a Global Assessment of Functioning (GAF) score of 67.[8]  (*Id*.).  Dr. Berg opined that

plaintiff appears capable of understanding, remembering and carrying out instructions; she is able

to perform simple tasks and appears capable of performing 2-3 step tasks; she appears capable of

maintaining attention and concentration, although she self-reported that she has difficulty in this

area and would like medication to help with these issues; she would have at least some difficulty

responding appropriately to supervision and coworkers in a work setting; and her concerns about

her physical health problems and what she described as her difficulty at times with attention and

concentration would reduce her ability to respond appropriately to work pressures in a work

setting.  (Tr. 545-46).

The ALJ gave "some weight" to Dr. Berg's assessment.  (Tr. 22).  The ALJ noted that

Dr. Berg examined plaintiff before she was on medication for Attention Deficit Disorder (ADD).

(*Id*.).  The ALJ stated that while Dr. Berg opined that plaintiff might have some difficulty

responding appropriately to supervision and co-workers and some difficulty dealing with work

pressures, Dr. Berg gave no specific workplace restrictions in that regard.  (*Id*.).

The ALJ gave "significant weight" to the assessment of the state agency non-examining

psychologist, Dr. Swain, who opined that plaintiff had moderate limitations in her abilities to

maintain attention and concentration for extended periods; to complete a normal work-day and

workweek without interruptions from psychologically based symptoms and to perform at a

---

[7] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id*.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id*. at 34.  The DSM-IV categorizes individuals with scores of 61-70 as having "some mild symptoms" or "some difficulty in social, occupational or school functioning . . . but generally functioning pretty well. . . ."  *Id*.

consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 22, citing Tr. 104-06).   The ALJ adopted the restrictions assessed by Dr. Swain, who limited plaintiff to relatively static duties, no rapid paced work, and superficial social contact.   (Tr. 105-06).   The ALJ found there was no support in the record for any greater limitations due to plaintiff's ADD, noting that plaintiff was prescribed medication for ADD after Dr. Berg's examination and plaintiff reported improvement in her concentration and focus to her doctors thereafter.   (Tr. 22).

The ALJ did not err in weighing the opinions of Drs. Berg and Swain.   Dr. Berg's assessment appears to be largely consistent with the mental RFC assessment completed by Dr. Swain, neither of which assessed disabling mental limitations.   The ALJ discussed his reasons for the weight assigned the two opinions and reasonably determined that the specific restrictions assessed by Dr. Swain corresponded with the degree of limitation found by Dr. Berg in his report. (Tr. 22, citing Tr. 105-06).   The ALJ also reasonably found that the record did not support the imposition of greater restrictions due to plaintiff's ADD.   (Tr. 22).   Plaintiff's reports to her doctors that the medication she was prescribed following Dr. Berg's assessment improved her concentration and focus support the ALJ's finding in this regard.   (*See* Tr. 596, 601-02; plaintiff reported to Dr. Fieler in October 2011, one month after Dr. Fieler assessed ADD and prescribed medication, that the medication was "doing well for controlling symptoms of ADD, particularly, attention span, getting things done," and Dr. Fieler reported that her ADD was "improved but not

17

controlled."; Tr. 614- plaintiff reported to Dr. Perry Wong, M.D., during a February 2013 check-up that she was "well with the attention deficit," she was starting school soon, and she had the "ability now to read easily and retain" information since being on medication).

In addition, although plaintiff alleges that the ALJ failed to properly weigh an opinion letter written by Ms. Snyder on February 16, 2012, the ALJ gave valid reasons for exercising his discretion to accord "little weight" to the opinion of Ms. Snyder, an "other source" under the regulations.  (Tr. 22, citing Tr. 610).  *See Cruse*, 502 F.3d at 541; 20 C.F.R. 404.1513(d).  Ms. Snyder wrote that plaintiff had been "evaluated in this office" and that she meets the diagnostic requirements for ADD with secondary indications of depression.  (Tr. 610).  Ms. Snyder stated: "This has had an effect on her maintaining employment due to the lack of concentration, her resulting frustration which many times leads to anger outbursts."  (*Id*.).  Ms. Snyder also stated that plaintiff was dealing with chronic pain and she depended on pain medications which, along with her medical expenses, had created a "vicious cycle of trying to juggle everything."  (*Id*.). Ms. Snyder opined that all of these conditions become overwhelming for plaintiff but that if she could get some relief in terms of her medical expenses, she could "work at taking the control she desires."  (*Id*.).  The ALJ found that Ms. Snyder's opinion was entitled to "little weight" because she identified herself as a therapist and did not appear to be an "acceptable medical source"; no narrative report or counseling records were submitted to support her evaluation of plaintiff or her diagnosis of ADD with indications of depression; there was no corroborating medical or other evidence of the "anger outbursts" referenced in the letter; Ms. Snyder appeared to rely on plaintiff's report on the level of her physical pain; and the letter provided no specific functional limitations.  (Tr. 22).  The ALJ thoroughly explained his reasons for the weight

18

accorded Ms. Snyder's opinion, and those reasons are substantially supported by the record.

Thus, the ALJ committed no error by discounting Ms. Snyder's opinion.

Finally, plaintiff asserts that the ALJ failed to give proper deference to the opinion of Dr.

Fieler, whom plaintiff characterizes as a "treating physician." (Doc. 10 at 11, citing Tr.

594-607; Doc. 16 at 8). As the Commissioner correctly notes, the record includes notes of only

two office visits with Dr. Fieler from September and October 2011. (Doc. 15 at 13, citing Tr.

594-607). Based on this limited number of office visits, it does not appear Dr. Fieler qualifies as

a "treating source" under the regulations. There is no indication plaintiff had an "ongoing

treatment relationship" with Dr. Fieler; *i.e.*, plaintiff did not see Dr. Fieler "with a frequency

consistent with accepted medical practice" for her condition. 20 C.F.R. § 404.1502. *See Yamin*

*v. Commissioner of Social Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) (doctor who examined

claimant on only two occasions did not have a long term overview of claimant's condition and

was not a treating physician).

Further, even if Dr. Fieler did qualify as a "treating physician," plaintiff concedes that Dr.

Fieler's treatment notes do not include an opinion as to plaintiff's functional limitations. (Doc.

16 at 8). As such, Dr. Fieler's treatment records do not constitute a "medical opinion" under the

Social Security regulations and "without more, are not the type of information from a treating

physician which will be provided great weight under 20 C.F.R. § 404.1513(b)." *Bass v.*

*McMahon*, 499 F.3d 506, 510 (6th Cir. 2007). Plaintiff nonetheless asserts that when considered

in conjunction with the opinions of Ms. Snyder and Dr. Berg, Dr. Fieler's "observations" in her

treatment notes "certainly reflect that [plaintiff] was independently disabled from the standpoint

of her ADHD," such that the ALJ's reliance upon the state agency non-examining psychologist's

opinion was misplaced.   (Doc. 16 at 8) (emphasis in original).   However, plaintiff does not

point to any observations in the treatment notes to support her argument.   Nor does a review of

Dr. Fieler's treatment notes disclose any observations indicative of debilitating symptoms

associated with ADD.[9]   Dr. Fieler did not make any abnormal objective findings on initial

physical examination of plaintiff on September 2, 2011.   (Tr. 599-606).   Further, Dr. Fieler's

notes reflect that when seen on October 6, 2011, plaintiff reported that her medication was

"doing well for controlling symptoms of ADD, particularly, attention span, getting things done."

(Tr. 596).   Dr. Fieler's objective findings from that date note that plaintiff appeared comfortable

and in no distress, and Dr. Fieler made no abnormal objective findings.   Dr. Fieler assessed

plaintiff's ADD as "improved but not controlled."   (*Id.*).

Thus, far from supporting a finding of disability due to plaintiff's ADD, Dr. Fieler's

treatment notes provide substantial support for the ALJ's findings that plaintiff's ADD symptoms

improved once she began taking medication for the condition and those symptoms were not

disabling.   Dr. Fieler's diagnosis of ADD, without any indication of functional limitations or

debilitating symptoms, does not suffice to show that the ALJ erred by fashioning a mental RFC

based on Dr. Swain's assessment.   *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)

(disability is determined by the functional limitations imposed by a condition, not the mere

diagnosis of the condition).

c.  **Conclusion**

For these reasons, the ALJ did not err in weighing the medical opinion evidence.   The

ALJ thoroughly discussed the medical opinions and the other medical and nonmedical evidence

---

[9] Dr. Fieler diagnosed plaintiff with ADD, not ADHD.   (See Tr. 596, 601).

of record and gave "good reasons" for the weight given each of the opinions.   Those reasons are substantially supported by the evidence of record.   Plaintiff's sole assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: _8/4/14_

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SUSAN ALPAJON,                                          Case No. 1:13-cv-617
    Plaintiff,                                         Beckwith, J.
                                                       Litkovitz, M.J.

    vs.


COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.   If the

Report and Recommendation is based in whole or in part upon matters occurring on the record at

an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or

such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless

the assigned District Judge otherwise directs.   A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in

accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).